UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

        Plaintiff,

vs.                            REPORT AND RECOMMENDATION

James Richard Ardito, Jr.,

           Defendant.        Crim. No. 08-355 (RHK/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I.  <u>Introduction</u>

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following Motions of the Defendant James Richard Ardito, Jr.:

> 1.    The Defendant's Motion to Suppress Statements, Admissions and Answers [Docket No. 21].
>
> 2.    The Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 22].

A Hearing on the Motions was conducted on December 11, 2008, at which time, the Defendant appeared personally, and by Douglas Olson, Assistant Federal Defender, and the Government appeared by Erika R. Mozangue, Assistant United States Attorney. For reasons which follow, we recommend that each of the Defendant's Motions be denied.

## II. Factual and Procedural Background

The Defendant is charged with one (1) Count of Armed Bank Robbery, in violation of Title 18 U.S.C. §2113(a) and (d). The events which gave rise to that charge are said to have occurred on or about September 27, 2007, in this State and District. See, Docket No. 1. As pertinent to those charges, and to the Motions now before us, the operative facts may be briefly summarized.[1]

---

[1]Rule 12(d), Federal Rules of Criminal Procedure, provides that "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record." See, United States v. Santiago, 410 F.3d 193, 198 (5th Cir. 2005), cert. denied, 126 S.Ct. 1565 (2006). As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion. Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require. See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

- 2 -

On September 27, 2007, the Deerwood National Bank ("Deerwood Bank"), in Garrison, Minnesota, was robbed.  <u>Id.</u>  Eyewitnesses described the robber as wearing a blue jacket, blue jeans, sunglasses, and a red and blue Twins hat.  <u>Government Exhibit 3</u>, at 2.  According to those witnesses, the robber entered the bank and proceeded to the teller who was furthest right from the door, and displayed a gun in securing the money he took.  <u>Id.</u>  Interviews of the bank employees disclosed that the manager of the bank, Sandy Hammer ("Hammer"), ran out of the bank, after the robber had left, and saw a male getting into what she thought was a silver Toyota Camry.  <u>Id.</u>  The robber drove away, from a parking spot that was not in front of the bank, with approximately $2,700.00 of the bank's money.  <u>Id.</u>

Nearly a year later, on September 24, 2008, Don Downie ("Downie"), who is a Deputy with the Crow Wing County Sheriff's Department, received information from Andrew Gutz ("Gutz") concerning the Deerwood Bank robbery.  <u>Id.</u>  Gutz reported that he was a friend of the Defendant, and that the Defendant had told Gutz that he had robbed the Deerwood Bank.  <u>Id.</u>  According to Gutz, the Defendant stated that, at the time he robbed the bank, he was wearing a jacket, sunglasses, and hat.  <u>Id.</u>

Gutz also related that the Defendant did not park in front of the bank and, when he entered the bank, he went to the furthest teller to the right.  <u>Id.</u>  The Defendant told

Gutz that he then displayed a gun and, after receiving approximately $2,000.00 to $3,000.00, he exited the bank. Id. Gutz told Downie that the Defendant had been followed out of the bank by a female, who saw him get into his car. Id. According to Gutz, the Defendant told him that he turned his car towards the town, id., and eventually drove to the highway in order to return to the Twin Cities area. Id. Gutz also disclosed that he had previously seen the Defendant wear a Minnesota Twin's hat, and a blue jacket. Id.

On that same day, Downie observed Gutz make an audio-recorded telephone call to the Defendant. Id. Gutz told the Defendant that he wanted to make him aware that law enforcement was asking questions about the Deerwood Bank robbery, and the Defendant responded that he understood. Id. Gutz told the Defendant that he should be concerned, and the Defendant responded that law enforcement had no proof that he did it. Id. Later in that same conversation, the Defendant directed Gutz not to say anything, or something bad might happen. Id.

At the Hearing, Shane Ball ("Ball"), who is a Special Agent with the Federal Bureau of Investigations ("F.B.I."), testified that, on September 25, 2008, the Defendant was taken into custody at his residence in Coon Rapids, Minnesota, and transported to the Anoka County Sheriff's Office, where he was placed in an interview

room.  At approximately 6:00 o'clock p.m., Ball and Downie entered that room to speak with the Defendant.  The interview was taped, and both Ball and Downie identified themselves as law enforcement officers.  Ball was wearing blue jeans and a police vest, but did not display a firearm.  Prior to questioning, Downie read the Defendant a <u>Miranda</u> warning.  See, <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).  As recounted by Ball, after being read his rights, the Defendant did not have any questions about the warnings, and he agreed to speak with Ball and Downie.  According to Ball, he never threatened the Defendant, nor did he promise the Defendant anything in return for his cooperation, although he advised that he would convey the Defendant's cooperation to the prosecutors, but that he did not make any promises that the information would have any effect, but it has in the past.  Ball testified that the Defendant appeared guarded, but not distressed.

Ball and Downie informed the Defendant that they wanted to speak to him about the Deerwood Bank robbery, and the Defendant denied being involved in that robbery.  During the interview, the Defendant did not ask for the questioning to cease but, eventually, he asked for an attorney.  Ball confirmed that the Defendant had invoked his right to counsel, at which time, Ball ended the interview except for an exchange of pleasantries.  Ball estimated that the interview had lasted about thirty (30)

minutes.  After the interview ended, the Defendant was moved to the Anoka County Jail.  Later in that same day, Downie applied for, and secured, a Warrant to search the Defendant's residence, and his mother's vehicle.  See, Government Exhibit 3.

In the days following the Defendant's interview, Ball received three (3) telephone calls from individuals who were associated with the Defendant, in which they reported that the Defendant wanted to speak to him.  At the time of the phone calls, the Defendant had been transferred to the Crow Wing County Jail ("the Jail"). Ball contacted that Jail in order to notify the Jail's personnel, as well as the Defendant, that he would be coming to speak with the Defendant on October 9, 2008.  Prior to the interview on October 9, 2008, Ball had not been in contact with the Defendant since the Defendant's arrest.  Ball and his partner, D. Ryan Williams ("Williams"), who is also a Special Agent with the F.B.I., met the Defendant and the Defendant's attorney, Mark Mitchell ("Mitchell"), who is a State Public Defender, in an interview room at the Jail.  At that time, the Defendant was in State custody, and was facing State criminal charges for the Deerwood Bank robbery.  Ball testified that he was unsure who had contacted Mitchell.

According to Ball, he asked the Defendant whether he wanted to speak, and the Defendant agreed to do so.  The Defendant was then read his Miranda warnings, and

he and Mitchell signed a form, on which they acknowledged that the warning had been administered.[2]  The Defendant did not have any questions about the <u>Miranda</u> warning before, or after, signing the acknowledgment form.  After signing the form, the Defendant gave a second statement.  Ball testified that, during that hour long interview, the Defendant appeared comfortable, cordial and conversational.

During the interview, Ball told the Defendant that he wanted the truth about what happened at the Deerwood Bank robbery.  At that point, the Defendant requested to speak with his attorney, and Ball and Williams left the room, and the Defendant conferred with his attorney for approximately five (5) minutes.  After the Defendant met with his attorney, Ball and Williams reentered the interview room.  Mitchell informed them that he was a State Public Defender, and represented the Defendant on the State criminal charges but, if Federal criminal charges were filed, he would likely cease his representation of the Defendant.  Ball testified that, after Mitchell's comment, the interview resumed.

---

[2]Ball testified that, before the Defendant or Mitchell signed the acknowledgment form, a minor change was made by crossing out the phrase "without a lawyer," and replacing it with the term "present," denoting that legal counsel was present during the questioning.  See, <u>Government Exhibit 2.</u>

Generally, the interview consisted of the Defendant providing information on suspects in other crimes.  Ball testified that he did not threaten nor promise the Defendant anything, in order to secure his cooperation.  Towards the end of the interview, Ball asked the Defendant where the gun, which had been used in the bank robbery, was located.  According to Ball, he was concerned about the gun's location because children frequented the Defendant's residence, and no gun, except for an empty Airsoft case, had been found during the search of that residence.  The Defendant stated that the gun was not real, and that he did not know its whereabouts.  Since interviewing the Defendant on October 9, 2008, Ball did not, again, interview the Defendant, although he has received phone calls from the Defendant concerning information that he provided during his interviews.

III.  Discussion

A.     The Defendant's Motion to Suppress Statements, Admissions, and Answers.

The Defendant maintains that the statements, which he provided on September 25, 2008, and October 9, 2008, were not voluntary, and were made without the assistance of counsel.  See, Docket No. 21.   We analyze each statement separately.

1.     Standard of Review.  Here, all agree that, at the time that the Defendant's statements were taken on September 25, 2008, and on October 9, 2008, the Defendant was in official custody, which requires the administration of a Miranda warning if the statement is to be admissible in the Government's case-in-chief.  See, Thai v. Mapes, 412 F.3d 970, 976 (8th Cir. 2005), cert. denied, 546 U.S. 1039 (2005) ("In Miranda, the Court held that police officers must inform a suspect of his Fifth Amendment privilege against self-incrimination prior to initiating a custodial interrogation.").  "A suspect may then waive th[o]se rights provided that the waiver is knowing, voluntary, and intelligent."  Id. at 977, citing Miranda v. Arizona, supra at 444.  "A waiver is 'knowing and intelligent' where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning

the right, and a waiver is 'voluntary' where the court can determine that the waiver was a product of the suspect's fee and deliberate choice, and not the product of intimation, coercion, or deception." United States v. Bell, 477 F.3d 607, 612 (8th Cir. 2007), quoting Thai v. Mapes, supra at 977.

Of course, "[a] statement is not voluntary if the totality of the circumstances shows the defendant's will was overborne." United States v. Annis, 446 F.3d 852, 855 (8th Cir. 2006), cert. denied, --- U.S. ---, 127 S.Ct. 3044(2007). As the Supreme Court has recently explained:

> The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." [Schneckloth v. Bustamonte, 412 U.S. at 226.] See also Haynes [v. Washington, 373 U.S. 503, 513] (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v. Pate, [367 U.S. 433, 440] (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account"); Malinski v. New York, [324 U.S. 401, 404] (1945)("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant"). The determination "depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." Stein v. New York, [346 U.S. 156, 185] (1953).

Id. at 434.

Among the circumstances, which are to be considered in this analysis are, first and foremost, whether a <u>Miranda</u> warning has been given, see, <u>Withrow v. Williams</u>, 507 U.S. 680, 693 (1993); any elements of "police coercion," see, <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986); the length of the interrogation, see, <u>Ashcraft v. Tennessee</u>, 322 U.S. 143, 153-154 (1944); the location of the interrogation, see, <u>Reck v. Pate</u>, 367 U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, <u>Leyra v. Denno</u>, 347 U.S. 556, 561 (1954). See also, <u>Withrow v. Williams</u>, supra at 693 (listing the applicable considerations).

Lastly, "[t]he government has the burden of proving by a preponderance of the evidence that, under the particular facts and circumstances of the case, the waiver was an intentional, voluntary, knowing, and intelligent relinquishment or abandonment of a know right or privilege." <u>United States v. Black Bear</u>, 422 F.3d 658, 663 (8th Cir.2005), citing <u>United States v. LeBrun</u>, 363 F.3d 715, 724 (8th Cir. 2004)[en banc].

2. <u>Legal Analysis.</u>   We examine the circumstances of the Defendant's two (2) statements in their chronological order. Notably, the Defendant has not detailed any specified objections to the statements given, apart from generally arguing that his statements were not voluntary.

a.     <u>The Defendant's Statement on September 25, 2008</u>.

The parties do not dispute that the Defendant was in custody when he gave his statement on September 25, 2008, and that, therefore, the law enforcement officers had an obligation to provide a <u>Miranda</u> warning prior to questioning the Defendant. Although the Defendant claims that the statement he gave to Ball and Downie were not voluntary, and were taken without the benefit of counsel, our review of the transcript of that interview reveals that the Defendant was provided a <u>Miranda</u> warning, and agreed to speak with the law enforcement officers. After being read his <u>Miranda</u> warning, Downie and the Defendant had the following exchange:

> [Downie]: Okay, you can decide at any time to exercise these rights and not answer any questions or make any statements do you understand that?
>
> [Def.]:      Yes.
>
> [Downie]: Having those rights in mind do you wanna speak with us?
>
> [Def.]:      Sure.
>
> [Downie]: Okay and I'm just gonna preface that by saying you know just by saying you can talk with us if there's a certain question you don't wanna answer you can certainly

feel free to tell, you know I don't wanna answer that question okay?

[Def.]:  Mm hm. (positive response)

Government Exhibit 1, at 2.

The only factor which supports the Defendant's claim, that his statement was not voluntary, is that the interview occurred in a police interview room.  The other factors weigh heavily against a finding that the Defendant's statement was involuntary. Downie and Ball did not use coercive tactics, nor did the length or continuous nature of the interrogation overcome the Defendant's free will.  In fact, Ball estimates that the Defendant's questioning lasted about thirty (30) minutes.  Furthermore, the fact that the Defendant invoked his right to counsel demonstrates that he understood his rights, and appreciated that he could fully exercise those rights.  In addition, the Defendant chose the questions that he would answer, and those that he would not, including a question about the identity of his girlfriend.  Notably, after asking for an attorney, the Defendant's questioning stopped.  The statement on September 25 was voluntarily given.

Nor can we agree with the Defendant's assertion, that his Sixth Amendment right was violated because he was questioned without the assistance of counsel.  "The right to counsel recognized in Miranda is sufficiently important to suspects in criminal

investigations, * * * that it 'requir[es] the special protection of the knowing and intelligent waiver standard.'"   Davis v. United States, 512 U.S. 452, 458 (1994) quoting Edwards v. Arizona, 451 U.S. 477, 483 (1981).   Nevertheless, "[i]f the suspect effectively waives his right to counsel after receiving the Miranda warnings, law enforcement officers are free to question him."   Id., citing North Carolina v. Butler, 441 U.S. 369, 372-376 (1979); see also, United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994).

"As a general matter * * * an accused who is admonished with the warnings prescribed by this Court in Miranda has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one * * *." United States v. Garlewicz, 493 F.3d 933, 936 (8th Cir. 2007), quoting Patterson v. Illinois, 487 U.S. 285, 296 (1988); see also, United States v. Harper, 466 F.3d 634, 643 (8th Cir. 2006)("An individual's waiver of * * * Sixth Amendment right to counsel is valid if made voluntarily, knowingly and intelligently."), cert. denied --- U.S. ---, 127 S.Ct. 1504 (2007), citing Miranda v. Arizona, supra at 444.  Since we have already determined that the Defendant voluntarily waived his Miranda rights, the Defendant waived his right to counsel as to any statements that he made prior to his

request for counsel.  As a result, we find that the Defendant's Motion to Suppress, as it pertains to his statement on September 25, 2008, should be denied as without merit.


b.      The Defendant's Statement on October 9, 2008.

Since the Defendant was also in custody during his questioning on October 9, 2008, he was entitled to the administration of a Miranda warning if the statement was to be admissible in the Government's case-in-chief.  See, Thai v. Mapes, supra at 976.  On October 9, 2008, the Defendant was accompanied by his attorney, and he was read his Miranda rights from an acknowledgment form.  The Defendant, and his counsel, signed the acknowledgment  form, in the presence of Ball.  See, Government Exhibit 2.

The only factor that supports the Defendant's argument, that his statement on October 9 was involuntary, was that, once again, his interview occurred within the Crow Wing County Jail.  However, the remaining facts and circumstances weigh heavily in favor of the conclusion that the Defendant's waiver was voluntary.  The Defendant received and waived his Miranda rights.  There is no evidence that Ball, or his partner, used coercion or promises in order to secure the Defendant's cooperation.

The interview was short in length -- approximately one (1) hour -- which also favors a finding that the Defendant's statement was voluntary.

Other factors also favor a voluntary interview. Notably, its was the Defendant and his family, and not Ball, who initiated the interview. Ball noted that, at the time of the interview, the Defendant was comfortable, cordial, and conversational. Furthermore, Ball and his partner honored the Defendant's <u>Miranda</u> rights by leaving the room, when they were requested to do so by the Defendant and his attorney. Most importantly, the Defendant was represented by counsel during the interview, and no objections were made, by either the Defendant or his counsel, to the taking of the statement, or the questions asked. Thus, the Defendant's own decision making was buttressed by his legal counsel, and the advices that his counsel was positioned to make.

According to Ball, the Defendant's counsel, Mitchell, made it clear that, if the Defendant was charged in Federal Court, then Mitchell would not be able to continue his representation of the Defendant. The Defendant may suggest that, since Mitchell would be unlikely to represent him against any Federal charges, he was without the benefit of counsel during his interview on October 9. We find such an argument unpersuasive. Although Mitchell represented, that he would not be able to represent

the Defendant in Federal Court, he was not foregoing his responsibility, and his duty, to ensure that the Defendant's rights were protected during that interview.  As noted by Ball, Mitchell was the Defendant's attorney during the interview.  "The presence of counsel * * * would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege," and "[h]is presence would insure that statements made in the government-established atmosphere are not the product of compulsion."  Miranda v. Arizona, supra at 466; see also, United States v. Guariglia, 757 F.Supp. 259, 264 (S.D.N.Y. 1991)( "Indeed, Miranda itself taught that what is protected by the mandatory warnings it prescribes is the presence of counsel [.]").  Accordingly, the Defendant had the benefit of counsel, and counsel's presence assured that the Defendant's statement would not be the product of compulsion, irrespective of whether that specific representation would continue in the future.

Nor do we find that it was the Defendant's asserted lack of legal counsel that caused him to provide his statement.  When Ball asked him about the gun's location, the Defendant was free to decline to answer that question, but the Defendant decided to continue his cooperation, and provided a response.  When all the circumstances are considered, we find that the Defendant's will was not overborne and his statement was

- 17 -

given voluntarily, and of his own free will.  As a consequence, we recommend that the

Defendant's Motion to Suppress Statements, Admissions, and Answers, be denied.

      B.     The Defendant's Motion to Suppress Evidence Obtained as
a Result of Search and Seizure.

      1.     Standard of Review.  In the issuance of a Search Warrant, the

Fourth Amendment dictates that an impartial, neutral, and detached Judicial Officer,

will assess the underlying factual circumstances so as to ascertain whether probable

cause exists to conduct a search, or to seize incriminating evidence, the

instrumentalities or fruits of a crime, or contraband.  See, Warden v. Hayden, 387 U.S.

294 (1967); United States v. Johnson, 64 F.3d 1120, 1126 (8th Cir. 1995), cert. denied,

516 U.S. 1139 (1996).  In order to find probable cause, it must be demonstrated that,

in light of all the circumstances set forth in the supporting Affidavit, there is a fair

probability that contraband, or evidence of a crime, will be found in a particular,

designated place.  See, United States v. Gladney, 48 F.3d 309, 313 (8th Cir. 1995);

United States v. Tagbering, 985 F.2d 946, 949 (8th Cir. 1993).  For these purposes,

probable cause is "a fluid concept, turning on the assessment of probabilities in

particular factual contexts, not readily, or even usefully, reduced to a neat set of legal

rules." Illinois v. Gates, 462 U.S. 213, 232 (1983); see also, Ornelas v. United States, 517 U.S. 690, 695 (1996).

"Search warrant '[a]pplications and affidavits should be read with common sense and not in a grudging hyper technical fashion.'" United States v. Ryan, 293 F.3d 1059, 1061 (8th Cir. 2002), quoting United States v. Goodman, 165 F.3d 610, 613 (8th Cir. 1999), cert. denied, 527 U.S. 1030 (1999). In conducting such an examination, the Court should review the Affidavits as a whole, and not on a paragraph-by-paragraph basis. See, United States v. Anderson, 933 F.2d 612, 614 (8th Cir. 1991); Technical Ordnance, Inc. v. United States, 244 F.3d 641, 649 (8th Cir. 2001), cert. denied, 534 U.S. 1084 (2002).

Moreover, the reviewing Court must not engage in a de novo review but, rather, should accord great deference to the decision of the Judicial Officer who issued the Warrant. See, United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995), cert. denied, 516 U.S. 903 (1995); United States v. Curry, 911 F.2d 72, 75 (8th Cir. 1990), cert. denied, 498 U.S. 1094 (1991). This mandated deference to the determination of the issuing Judicial Officer is consistent with the Fourth Amendment's sound preference for searches that are conducted pursuant to Warrants. See, Illinois v. Gates, supra at 236.

2.    <u>Legal Analysis.</u>  The Defendant asks that we review the four (4) corners of Government Exhibit 3 -- the Search Warrant and Affidavit which authorized the search of the Defendant's residence and his mother's vehicle -- in order to determine whether the Warrant was supported by probable cause, or contained other fatal defects.   No testimony was adduced at the Hearing on this aspect of the Defendant's Motion, and therefore, we limit our consideration to the contents of the challenged Search Warrant, and its supporting papers.   Further, as was the case with the Defendant's statements, the Defendant advances no specific objections to the Warrants, other than generally objecting to the sufficiency of probable cause.

Having considered all of the particulars of the Warrant at issue, our review confirms the appraisal of the issuing Judicial Officer, that ample probable cause supported the issuance of the Warrant, and further, that the Warrant was not otherwise fatally defective.  The contested Search Warrant was issued by an Anoka County State Court, on September 25, 2008.   The Search Warrant authorized a search for a Minnesota Twins hat, blue jackets, a handgun, sunglasses, as well as any items to show the constructive possession of the residence and vehicle, including papers, letters, and notes.  See, <u>Government Exhibit 3.</u>  In support of the Search Warrant, Downie submitted an Application and Affidavit which set forth the reasons that

caused him to believe that the specified items constitute evidence of a crime that had been committed, or tended to show that a particular person had committed a crime. See, <u>Government Exhibit 3</u>, at 2.

As we have detailed, in his Affidavit, Downie attested that, on September 27, 2007, the Deerwood Bank was robbed by a white male, who was approximately forty (40) years old, wearing a blue jacket, blue jeans, sunglasses, and a red and blue Minnesota Twins baseball hat.  <u>Id.</u> at 3.  The robber entered the bank, went to the teller booth which was the furthest to the right of the entrance, and demanded money while showing a handgun described as a pistol-type weapon.  <u>Id.</u>  After receiving approximately $2,700.00 in cash, the robber left the bank.  <u>Id.</u>  In an interview with law enforcement, Hammer, who is the Deerwood Bank's manager, stated that, when she learned about the robbery, she ran out the exit that faces the lake.  <u>Id.</u>  Once outside the bank, she noticed no vehicles parked outside the front of the bank, and started to run up the street, in a northwest direction.  <u>Id.</u>  As she headed up the street, she saw a male getting into what she believed to be a silver Toyota Camry, which was parked northwest of the bank, in front of a closed business.  <u>Id.</u>  Hammer watched the vehicle turn left into town.  <u>Id.</u>

- 21 -

Downie further attested that, on September 24, 2008, he received information from Gutz concerning the Deerwood Bank robbery.  Id.  In his discussions with Downie, Gutz advised that he was a friend of the Defendant, and that the Defendant had told Gutz that he had robbed the Deerwood Bank.  Id.  Gutz related to Downie that the Defendant had stated that he had worn a jacket, hat, and sunglasses, during the robbery, and did not park his vehicle in front of the bank.  Id.  According to Gutz, the Defendant entered the bank, went to the teller furthest to the right from the entrance and demanded money, while showing the teller a gun.  Id.  The Defendant told Gutz that he saw a female leave the bank, and that she saw him get into his car.  Id.  Gutz also told Downie that the Defendant turned the vehicle towards town, before heading to the highway, on his way back to the Twin Cities area.  Id.  According to Gutz, the Defendant stated that he had taken approximately $2,000.00 to $3,000.00. Id.  Gutz also disclosed that he had previously seen the Defendant wear a Minnesota Twins hat, and a blue jacket.  Id.

The Affidavit further disclosed that, on that same day, Downie, with Gutz's assistance, conducted an audio-recorded telephone call, in which the Defendant stated that law enforcement had no proof that he had committed the robbery and that Gutz had better not say anything, or something bad could happen.  Id.

- 22 -

As recounted in the Affidavit, based upon that information, the Defendant was arrested, and interviewed, on September 25, 2008. Id. at 3. Downie averred that, during that interview, the Defendant admitted to owning a Minnesota Twins hat which he believed to be at his residence. Id. The Defendant stated that he had lived at that residence, with his mother, since his release from prison in May of 2007. Id. The Defendant also admitted to owning a jacket, which was similar to the one worn by the bank robber, and to driving his mother's silver Toyota Camry. Id. The Defendant further disclosed that he had been in Garrison in 2007, in his mother's silver Toyota Camry, and had previously been in the Deerwood Bank. Id. Lastly, Downie believed that the Defendant shared similar physical characteristics to the bank robber, based upon the Deerwood Bank's video surveillance footage.[3] Id.

As is plain, at least some of the information, which is contained in the Affidavit, was supplied by the Defendant's friend, Gutz. Although not specifically challenged by the Defendant, we examine whether Gutz's information properly contributes to the overall showing of probable cause. Where, as here, probable cause for a Search

---

[3]Based upon Downie's averments, the Search Warrant was issued, and executed, on September 25, 2008. The Search uncovered the following: a pair of sunglasses, a Minnesota Twins hat, a jacket from an upstairs bedroom, an empty gun box, a letter in the kitchen addressed to the Defendant, and two (2) plastic bags filled with a white substance. Government Exhibit 3, at 6.

Warrant is based upon information provided by an informant, "'a key issue is whether that information is reliable.'"   United States v. Koons, 300 F.3d 985, 993 (8th Cir. 2002), quoting United States v. Fulgham, 143 F.3d 399, 401 (8th Cir. 1998); see also, United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)("[T]he informant's reliability, veracity, and basis of knowledge are relevant considerations -- but not independent, essential elements -- in finding probable cause.").   As our Court of Appeals has stated:

> In [Illinois v.] Gates, the Supreme Court explained that an informant's reliability and basis of knowledge "are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." * * * 462 U.S. at 233, 103 S.Ct. at 2329.

United States v. Olson, 21 F.3d 847, 850 (8th Cir. 1995).

As a result, "'an informant's basis of knowledge [is] an important consideration, but not a rigid requirement, in the probable cause determination.'"   Id., citing United States v. Anderson, supra at 615.

As a consequence, in assessing the tips of an informant, the "core question" is whether those tips were reliable.  See, United States v. Williams, 10 F.3d 590, 593 (8th

Cir. 1993)("The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable.").   Under the governing law, "[t]he statements of a reliable confidential informant are themselves sufficient to support probable cause." United States v. Wright, 145 F.3d 972, 975 (8th Cir. 1998).  An informant is deemed reliable when his statements are corroborated by independent evidence.  See, United States v. Carpenter, 341 F.3d 666, 669 (8th Cir. 2003) ("[C]orroboration of minor, innocent details may support finding of probable cause."), citing United States v. Tyler, 238 F.3d 1036, 1039 (8th Cir. 2001); see also, United States v. Koons, supra at 993 ("'Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence.'"), quoting United States v. Fulgham, supra at 401; United States v. Formaro, 152 F.3d 768, 770 (8th Cir. 1998)("[C]orroboration of the confidential informant's information by independent investigation is an important factor in the calculus of probable cause.").

Here, we find that Downie reasonably relied upon the information provided by Gutz, because Downie personally interviewed Gutz, see, United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005), quoting Florida v. J.L., 529 U.S. 266, 270

(2000)("[A] known informant * * * can be held responsible if her allegations turn out to be fabricated."), and because Gutz came forward of his own free will.  See, <u>Illinois v. Gates</u>, 462 U.S. 213, 233-34 (1983)( "Likewise, if an unquestionably honest citizen comes forward with a report of criminal activity -- which if fabricated would subject him to criminal liability -- we have found rigorous scrutiny of the basis of his knowledge unnecessary."), citing <u>Adams v. Williams</u>, 407 U.S. 143, 146-47 (1972); <u>United States v. Lewis</u>, 738 F.2d 916, 922 (8th Cir. 1984)(finding that a women who volunteered to help a postal inspector had no motive to lie and the basis of her knowledge was clearly laid out in the Affidavit), cert. denied, 470 U.S. 1060 (1985); <u>United States v. Ross</u>, 713 F.2d 389, 393 (8th Cir. 1983)(concluding that a telephone company employee had no motive to falsify information that he had intercepted while checking a phone line).

We acknowledge that Downie did not disclose, in his Affidavit, whether Gutz had worked previously as an informant for law enforcement, but Gutz's status, as an unproven informant, does not change our finding that Gutz's information was reliable. "Though less reliable than informants with a proven record, unproven informants are more reliable than anonymous tipsters because the police can hold them responsible for false information."  <u>United States v. Nolen</u>, 536 F.3d 834, 840 (8th Cir. 2008),

quoting <u>United States v. Kent</u>, 531 F.3d 642, 648 (8th Cir. 2008).   Information

received from unproven informants must be independently verified or corroborated

by law enforcement in order to establish reliability.   <u>Id.</u>

Here, Gutz's information was independently verified through Gutz's audio-

recorded telephone call with the Defendant, which was independently audited by

Downie.   Furthermore, the description of the bank robbery, which the Defendant

relayed to Gutz, matched the details that Hammer, and the other eyewitnesses to the

robbery, had provided to law enforcement.   Lastly, the Defendant's statement, which

was made shortly after his arrest, confirmed Gutz's information, that the Defendant

did have a Minnesota Twins hat, as well as a blue jacket, which he believed were still

stored in his home.   See, <u>United States v. Solomon</u>, supra at 828 ("It is well

established that '[e]ven the corroboration of minor, innocent details can suffice to

establish probable cause * * *.'"), quoting <u>United States v. Tyler</u>, 238 F.3d 1036, 1039

(8th Cir. 2001), quoting, in turn, <u>United States v. Reiner Ramos</u>, 818 F.2d 1392, 1398

n. 7 (8th Cir. 1987).   Therefore, we find that Gutz's information was reliable, and

provided probable cause for the Search Warrant.

Again, while not a specific objection of the Defendant, we also find that the

information contained in the Search Warrant had not become impermissibly stale by

the time the Search Warrant was issued, and executed.  "It is axiomatic that probable cause must exist at the time of the search and not merely at sometime earlier." United States v. Kennedy, 427 F.3d 1136, 1141 (8th Cir. 2005), citing United States v. Formaro, supra at 771; see, United States v. Ozar, 50 F.3d 1440, 1446 (8th Cir. 1995), cert. denied, 516 U.S. 871 (1995).  Therefore, a lapse of time, between the observations of a witness, and the issuance of a Search Warrant, like a delay in executing a Search Warrant, "may make probable cause fatally stale." United States v. Maxim, supra at 397 [quotations omitted].

"There is no bright-line test for determining when information is stale," and the passage of time, alone, is "not always the controlling factor," as other factors, such as "the nature of the criminal activity involved and the kind of property subject to the search," are also relevant to the inquiry.  Id., quoting United States v. Koelling, 992 F.2d 817, 822 (8th Cir. 1993); United States v. Rugh, 968 F.2d 750, 754 (8th Cir. 1992); see also, United States v. Kennedy, supra at 1141; United States v. Chrobak, 289 F.3d 1043, 1046 (8th Cir. 2002).  As but one example, when the Affidavit alleges an "ongoing continuous criminal enterprise, the passage of time between the receipt of information and the search becomes less critical in assessing probable cause." United States v. Rugh, supra at 754.

- 28 -

Therefore, in our analysis, we must not "simply count[] the number of days between the occurrence of the facts supplied and the issuance of the affidavit," but must consider any passage of time "in the context of a specific case and the nature of the crime under investigation." United States v. Maxim, supra at 397, quoting United States v. Koelling, supra at 822. Furthermore, "'where recent information corroborates otherwise stale information, probable cause may be found.'" United States v. Ozar, supra at 1446, quoting United States v. Macklin, 902 F.2d 1320, 1326 (8th Cir. 1990), cert. denied, 498 U.S. 1031 (1991).

Although Gutz contacted law enforcement nearly one (1) year after the bank robbery, the Defendant was interviewed, and the Search Warrant was issued, within one (1) day of Gutz's information. See, United States v. Perry, 531 F.3d 662, 666 (8th Cir. 2008)(concluding that information was not stale even though the crime had taken place eight (8) months earlier); United States v. Hanton, 189 Fed.Appx. 247, 251 (4th Cir. 2006)(finding that the Search Warrant was supported by probable cause even though the Affidavit in support of the warrant detailed events that had taken place three (3) years earlier), cert. denied, 549 U.S. 1140 (2007); United States v. Maxim, 55 F.3d 394, 388 (8th Cir. 1995)(concluding that a Search Warrant was supported by

probable cause despite the fact that it was supported by four (4) year old information), cert. denied, 516 U.S. 903 (1995).

Here, the critical factor is not the year that extended, between the bank robbery and the issuance of the Warrant, for the earlier information, which was secured from the eyewitnesses to the robbery, and which might be regarded as stale, was freshened by the more recent information that was secured from Gutz, and from the interview of the Defendant on September 25, 2008.  According to the Defendant's own admissions, a Twins cap, and a blue jacket, which closely matched those depicted in the bank's surveillance videos, were believed, by him, to be located in his home. There is nothing stale about that information, nor is there anything stale about the Warrant that was issued by the State Court.  See, e.g., United States v. Macklin, supra at 1326 ("We agree with the First Circuit that '[w]here recent information corroborates otherwise stale information, probable cause may be found.'"), quoting Emery v. Holmes, 824 F.2d 143, 149 (1st Cir. 1987).[4]

---

[4]Given the circumstances presented here, "even assuming that the information in the affidavit was stale, the 'good faith' exception of United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), would apply."  United States v. Gettel, 474 F.3d 1081, 1086 (8th Cir. 2007).

Lastly, reading the Search Warrant, and the Supporting Affidavit as a whole, we conclude that the issuing Judge properly found probable cause for the search of the Defendant's residence, and his mother's vehicle.  The law in this Circuit is clear that "there must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue."  United States v. Tellez, 217 F.3d 547, 550 (8th Cir. 2000).  However, to sustain that nexus, the Application for the Search Warrant need only establish a "fair probability" that the named contraband would be found in a particular place, based on the circumstances described in the Application.  Id. at 549.

During his interview, that was conducted before the Warrant issued, and that was detailed in Downie's Affidavit, the Defendant admitted to living at his mother's residence, and to using his mother's silver Toyota Camry.  Furthermore, the Defendant's admissions, at the very least, suggested that he shared similarities with the individual who robbed the Deerwood Bank, and furnished further probable cause for the Search Warrant.  Specifically, the Defendant admitted to owning a Minnesota Twins hat, and a blue jacket, both of which could be found in his residence, and he further admitted that he had previously been in the Deerwood Bank, and that his

mother owned a silver Toyota Camry, which he had driven to Garrison in 2007.   In

sum, we find no basis to sustain a substantive challenge to the Warrant at issue.

Moreover, our function, at this juncture, is not to review the Search Warrant <u>de</u>

<u>novo</u>, but simply to determine whether the issuing Judicial Officer "had a substantial

basis for * * * concluding that probable cause existed."  <u>United States v. Olvey</u>, 437

F.3d 804, 807 (8th Cir. 2006), quoting <u>United States v. Gladney</u>, supra at 312.  Here,

we are satisfied that the Affidavit presented a sufficient nexus, between the Defendant

and his residence, and his mother's vehicle, to satisfy the probable cause standard.

See, <u>United States v. Neumann</u>, 183 F.3d 753, 756 (8th Cir. 1999) ("Probable cause

requires 'only a probability or substantial chance of criminal activity, not an actual

showing of such activity.'"), quoting <u>Illinois v. Gates</u>, supra at 243-44 n. 13. Further,

we find no fatal deficiencies in the specificity of the Warrant, or in any other of its

details, and the Defendant does not suggest any.  Therefore, we recommend that the

Defendants' Motions to Suppress Evidence Obtained as a Result of Search and

Seizure be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1.    That the Motion of the Defendant James Richard Ardito, Jr. to Suppress Statements, Admissions and Answers [Docket No. 21] be denied.

2.    That the Motion of the Defendant James Richard Ardito, Jr. to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 22] be denied.


Dated: December 29, 2008                    *s/Raymond L. Erickson*
                                            Raymond L. Erickson
                                            CHIEF U.S.  MAGISTRATE JUDGE


NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than January 15, 2008**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than January 15, 2008**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.